UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEPING LI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> KEQIANG LI, et al., <br><br> Defendants. | Civil Action No. 20-2008 (JMC) |

**MEMORANDUM OPINION**[1]

Three individuals filed suit claiming that the Chinese government illegally expropriated tens of millions of dollars' worth of property that they owned in China, with the Industrial Commercial Bank of China (ICBC)[2] serving as a conspirator-intermediary. Plaintiffs seek damages, a declaratory judgment stating that Defendants violated international law, and either an injunction barring the sale of any unsold properties or the disgorgement of profits from the sale. Because the Court finds that Defendants Keqiang Li, Shengkun Guo, Xinshe Lu, Yaojun Meng, and the John Does are immune from suit under the Foreign Sovereign Immunities Act (FSIA), Plaintiffs' claims against those Defendants are dismissed sua sponte for lack of subject matter jurisdiction. As for Defendant ICBC, the Court grants its Motion to Dismiss under Rule 12(b)(6). ECF 29. Having thus disposed of all Plaintiffs' claims, the Court dismisses the case.

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

[2] Defendant represents that its correct name is Industrial and Commercial Bank of China Limited. *See* ECF 20 at 1.

I.  BACKGROUND

There are three Plaintiffs in this case, each of whom is of Chinese origin and currently lives in the District of Columbia. ECF 3 ¶¶ 29, 56, 81. Plaintiff Heping Li is a permanent resident of the United States, but not a citizen. *Id.* ¶ 28. Plaintiff Yanlan Huang moved to the United States in 1999 and became a United States citizen in 2020. *Id.* ¶ 179; *id.* at 26 n.*. Plaintiff Xiaogang Shi is a United States citizen, though the record does not indicate when he became one. *Id.* ¶ 56; ECF 37 at 8. Both Li and Shi were previously married to Huang. ECF 3 ¶¶ 93, 119.

Defendants are four Chinese government officials in their official capacities, an unspecified number of John Does, and the ICBC. *Id.* at 1. The John Does are Chinese officials who orchestrated, participated in, or benefitted from the expropriation of Plaintiffs' property. *Id.* ¶¶ 209–14. The ICBC is China's state-owned bank. *Id.* ¶ 198. The ICBC has branches around the world, including in New York City. *Id.* ¶ 198–99.

The Amended Complaint alleges the following. On August 16, 2002, Plaintiff Li was arrested in Shanghai on the grounds that he and his former wife, Plaintiff Huang, had embezzled a large sum of money and used it to purchase dozens of apartments in Shanghai. *Id.* ¶¶ 31, 37. Li was kept in "secret detention" by the People's Procuratorate of Guilin City for 145 days, during which time the authorities attempted (and failed) to coerce him into signing a false confession. *Id.* ¶ 34. Li was "brutally tortured" by his captors—subjected to sleep deprivation, solitary confinement, dehydration, electric shocks, painful restraints, and involuntary drug use. *Id.* ¶¶ 34–35. That left him with brain damage, renal failure, and permanent erectile disfunction. *Id.* ¶ 36.

Also in August 2002, the Chinese government seized various properties from Plaintiff Huang (Li's former wife), who had relocated to the United States in 1999. *Id.* ¶¶ 124–25, 179. Amongst the seized property was a corporation of which Huang was the majority owner, several pieces of valuable real estate owned by that corporation, and Huang's personal savings. *Id.* at

¶¶ 124–25, 127, 179. Huang's share of the seized corporation—which was nationalized by the Chinese government, *id.* ¶ 125—was worth approximately 45 million U.S. dollars. *Id.* ¶ 180.

In February 2003, the government auctioned off, without Li's consent and a for a fraction of their value, nineteen of Li's "best located apartments," cumulatively worth around 26 million U.S. dollars. *Id.* ¶ 38. That transaction was facilitated by Defendant ICBC, with the cooperation of the Chinese courts. *Id.* ¶¶ 40, 204. In December 2004, Li was sentenced to life imprisonment. *Id.* ¶ 42. He appealed that conviction, and it was reversed for insufficient evidence. *Id.* ¶¶ 43–46. Li petitioned the Intermediate Court of Guilin City for state compensation for his detention and torture and for the confiscation of his property. *Id.* ¶ 47. The court agreed to compensate Li for his wrongful imprisonment, but not for the torture or for the loss of his apartments. *Id.* ¶ 48. In 2017, after considerable litigation, those proceedings were terminated. *Id.* ¶¶ 130–31.

A second round of seizures took place in December 2016, when the People's Procuratorate of Guilin City seized twenty-one Shanghai apartments owned by Plaintiff Shi, who (like Huang) was living in the United States at the time. *Id.* ¶ 60. Shi had purchased the apartments from Li in February 2000, at which time Shi was married to Huang. *Id.* ¶¶ 57, 113. The stress from the seizure of his property, along with the legal wrangling (and threats) that followed, caused Shi to suffer a heart attack, leaving him "paralyzed, unable to walk, talk, eat, and completely disabled." *Id.* ¶ 67. The seizure was upheld in court, and on appeal. *Id.* ¶¶ 68, 76–77.

Plaintiffs make the following claims against various Defendants: (i) illegal expropriation of private property; (ii) torture; (iii) cruel, inhuman, or degrading punishment; (iv) arbitrary arrest; (v) forced labor; (vi) battery and assault; (vii) false imprisonment; (viii) distortion and blackmailing; (ix) pain and suffering; (x) intentional infliction of emotional distress; (xi) conversion and unjust enrichment; and (xii) civil conspiracy. *Id.* ¶¶ 237–94. Defendant ICBC

moved to dismiss for, amongst other things, lack of subject matter jurisdiction and failure to state a claim. ECF 29. Plaintiffs filed an Opposition, ECF 37, and the ICBC filed a Reply, ECF 38. No other Defendant has responded to the Amended Complaint.

## II. LEGAL STANDARDS

### A. Subject matter jurisdiction

Federal district courts are courts of limited jurisdiction and may only hear cases over which they have subject matter jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "It is axiomatic that subject matter jurisdiction may not be waived, and that courts may raise the issue sua sponte." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008).

To establish subject matter jurisdiction, a plaintiff's pleading must "affirmatively and distinctly" demonstrate "the existence of whatever is essential to federal jurisdiction." *Smith v. McCullough*, 270 U.S. 456, 459 (1926). In evaluating whether a complaint establishes subject matter jurisdiction, "the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Thomas v. Washington Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 81 (D.D.C. 2018); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). However, unlike with a Rule 12(b)(6) motion, when evaluating subject matter jurisdiction, the Court "may consider materials outside the pleadings." *Jerome Stevens Pharms.*, 402 F.3d at 1253.

### B. Motion to dismiss under Rule 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In evaluating a motion to dismiss under 12(b)(6), a court "must treat the complaint's factual allegations as true, and must grant [the] plaintiff the benefit of all inferences that can be derived

4

from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). That said, a court need not accept "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Nor must a court accept "legal conclusions cast in the form of factual allegations." *Id.*

### III. ANALYSIS

The individual Defendants in this case—both the named government officials and the John Does—are immune from suit under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 *et seq*. Plaintiffs' claims against those Defendants are therefore dismissed, sua sponte, for lack of subject matter jurisdiction. Although the ICBC has not shown that it enjoys FSIA's presumptive immunity, the Court concludes that Plaintiffs have failed to state a claim against the ICBC upon which relief can be granted, and therefore grants its Motion to Dismiss.

**A. The named government Defendants and the John Does are immune from suit under the FSIA.**

The FSIA affords the "sole basis for obtaining jurisdiction over a foreign state" in United States courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, foreign governments are presumptively immunized from lawsuits brought against them in the United States, though that immunity is "subject to certain enumerated exceptions" set forth in the statute. *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993). FSIA immunity extends to both a foreign sovereign in its own name, and to its political subdivisions, agencies, and instrumentalities. 28 U.S.C. § 1603(a). A court is obligated to determine whether immunity is available under the FSIA, even where the foreign state does not enter an appearance in the case. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983)

Once the Court determines that a defendant enjoys presumptive immunity under the FSIA, the plaintiff bears the "initial burden" of "making out a legally sufficient case" that a FSIA

5

exception applies. *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 Fed. App'x 442, 449 (D.C. Cir. 2018); *see also Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). After that, "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008).

Thus, in determining whether the Court has subject matter jurisdiction to hear Plaintiffs' claims against the individual Defendants, the Court's analysis comes in two parts. First, the Court determines—based on the allegations in the Amended Complaint—that the individual Defendants are extensions of the Chinese state, and therefore enjoy presumptive immunity under the FSIA. Second, the Court concludes that Plaintiffs have not carried their burden to plead facts that would establish that any FSIA exception applies to their claims against the individual Defendants. Therefore, those claims are dismissed sua sponte for lack of subject matter jurisdiction.

> 1. *The individual Defendants are extensions of the Chinese state, and therefore enjoy presumptive immunity under the FSIA.*

The question whether an officer of a foreign state enjoys presumptive immunity under the FSIA is not always a straightforward inquiry. An individual official is not automatically covered by the FSIA, even if sued i*n their official capacity* for actions taken while acting on behalf of a foreign state. *See Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) ("[W]e do not doubt that in some circumstances the immunity of the foreign state" under the common law "extends to an individual for acts taken in his official capacity. But it does not follow from this premise that Congress intended to codify that immunity in the FSIA".). On the other hand, when "the state is the real party in interest" to a suit, "it may be the case that some actions against an official in his official capacity should be treated as actions against the foreign state itself," such that they are subject to

FSIA immunity. *Id.* at 325 (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (emphasis in original))). Considering the above, other courts in this jurisdiction have applied the following standard to determine whether the FSIA applies to a foreign official: "[T]o determine whether a suit against a foreign official is governed by the FSIA, this Court must look to whether the suit is against the official personally or whether the state is the real party in interest." *Odhiambo v. Republic of Kenya*, 930 F. Supp. 2d 17, 34 (D.D.C. 2013), *aff'd*, 764 F.3d 31 (D.C. Cir. 2014); *see also Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17, 30–31 (D.D.C. 2017), *aff'd*, 756 Fed. App'x 16 (D.C. Cir. 2019).

With regard to the four named government officials, the Amended Complaint makes it clear that the Chinese state is the real party in interest. Each of those Defendants is sued in their official capacity. ECF 3 at 1. The Amended Complaint contains no non-conclusory allegations that any of the named officials personally ordered or participated in Li's arrest, imprisonment, torture, or prosecution, or that they ordered, participated in, or profited from the expropriation of Plaintiffs' properties. Rather, each official is discussed solely in his capacity as the representative of the government department they oversaw. *See, e.g., id.* ¶¶ 133, 138, 163, 167. Indeed, the Amended Complaint's very first paragraph states that the case is about "crimes by the totalitarian regime of the People's Republic of China (PRC) under the [reign] of Chinese Communist Party (CCP)." *Id.* ¶ 1. Plaintiffs go on to describe, at some length, an alleged longstanding Chinese policy of "expropriat[ing] real property from its land owner[s] through state organized violence."[3]

---

[3] Indeed, despite its caption, the Amended Complaint regularly refers to various government subdivisions as defendants in the case. *See, e.g., id.* ¶ 29 ("Defendant Regional Branch of Chinese Communist Party"); *id.* ¶ 149

*Id.* ¶¶ 7–15. Finally, like in *Odhiambo* and *Nnaka,* there is no indication that Plaintiffs are seeking damages directly from the pockets of the individual Defendants. *See* ECF 3 at 58–59; *see also Graham*, 473 U.S. at 166 ("A plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself."). Thus, the Court concludes that Plaintiffs' suit is not really targeted at any of the named individuals, but at the state itself.

The Court reaches the same conclusion with regard to the John Does. To the extent Plaintiffs elaborate on the John Does' identities, they make no suggestion that any are being sued in anything other than their official capacities.[4] The John Does (some of whom are, paradoxically, identified by name), are the "former acting Secretary of the CCP Branch of Guangxi Autonomous Region of Zhuang Nationality," *id.* ¶ 210, "the Chief 'Justice' of the Supreme People's Court of the 'PRC,'" *id.* ¶ 211, the Intermediate People's Court of Guilin (the institution), *id.* ¶ 212, and "[a]ll terrorist attackers, uniformed or plain clothed street thugs, bouncers, police interrogators, wards, prison guards, medical personnel in prison facilities, commercial auctioneers, bankers and financiers involved in such illegal expropriations and tortures, who are accountable but their liability was carried by their masters as the Defendants here under the theory of '*respondeat superior*,'" *id.* ¶ 213. Given the lack of detail in the Amended Complaint about the specific actions

---

("Defendant Central Committee"); *id.* ¶ 175 ("defendant People's Procuratorate of Guilin City"). Those instances are each further evidence that the true target of the suit is the Chinese government, not any particular individual.

[4] The one potential exception is "John Doe number 4," identified as Hsow Hsiong Tsai, a Taiwanese citizen who purchased the expropriated properties at auction. *See* ECF 3 at ¶ 213. As an initial matter, it is self-refuting to identify a "John Doe" defendant by name; normally, if a plaintiff knows the identify of a defendant but chooses not to name them in the complaint, that individual is not a defendant. Moreover, the same paragraph in the Amended Complaint that introduces Tsai as "John Doe number 4" confirms that he is not a defendant in the case. *See id.* (stating that Tsai "should have been named as [a] Defendant . . . but for his said to be deceased and/or become otherwise traceless"); *see also id.* at ¶ 38 (suggesting that Tsai "will probably be sued in separate action"). The Court therefore reads the Amended Complaint as laying down a marker that Tsai might be sued in a different lawsuit, and concludes for purposes of this Opinion that he is not a party to this suit.

of the John Does as individuals, the invocation of *respondeat superior* (which requires that all John Does are sued for actions taken "within the scope of their employment," *Boykin v. District of Columbia*, 484 A.2d 560, 561 (D.C. 1984)), and the lack of any suggestion that the John Does should be held personally liable, the Court determines that the Amended Complaint is clear that the true party of interest in the claims against the John Does is the Chinese state. Accordingly, the Court concludes that all individual Defendants are entitled to presumptive immunity under the FSIA.[5]

> 2. *No FSIA exception applies to Plaintiffs' claims against individual Defendants. Those claims are therefore dismissed for lack of subject matter jurisdiction.*

The Court next considers whether any FSIA exceptions apply to abrogate presumptive immunity. In both their Amended Complaint, ECF 3, and their response to the ICBC's Motion to Dismiss,[6] ECF 37, Plaintiffs point to three such exceptions: the "expropriation exception," *see* 28 U.S.C. § 1605(a)(3), the "terrorism exception," *see* 28 U.S.C. § 1605A, and the FSIA's carve-out for "international agreements to which the United States is a party." 28 U.S.C. § 1604. The Court concludes that none of those exceptions apply to Plaintiffs' claims.

---

[5] Even if the FSIA does not apply to one or more of the individual Defendants in this case, common-law foreign official immunity would still require the Court to dismiss the claims against those individuals for want of subject matter jurisdiction. Although the D.C. Circuit has never formally adopted the standard for foreign official immunity set forth in the Restatement (Second) of Foreign Relations Law of the United States § 66(f) (1965), it has twice in recent years assumed that standard applies in affirming decisions from the District Court. *See Miango v. Democratic Republic of Congo*, No. 20-5244, 2022 WL 10219715, at *1 (D.C. Cir. Oct. 18, 2022); *Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir. 2019). Under the Restatement's standard, the Court may not hear any case against a "public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." Restatement (Second) of the Foreign Relations Law of the United States § 66(f). That standard is undoubtedly satisfied here, where all individual Defendants are sued in their official capacities, and the gravamen of Plaintiffs' claims is that both the state-sanctioned arrest and imprisonment of Li and its seizure of Plaintiffs' property in China were unlawful.

[6] The ICBC moved to dismiss for, amongst other things, lack of subject matter jurisdiction under the FSIA. *See* ECF 29-1 at 19–23. Although the Court determines that the ICBC does not enjoy the FSIA's presumptive immunity, *see infra* Part III.B.1, the Court considers Plaintiffs' arguments on that point here.

(a) <u>The FSIA's expropriation exception does not apply.</u>

Plaintiffs contend that the Court has jurisdiction to hear their claims involving the seizure of their property under the FSIA's expropriation exception. *See* 28 U.S.C. § 1605(a)(3). That exception abrogates a foreign state's FSIA immunity when a claim satisfies the following three elements: "(1) rights in property are at issue; (2) those rights were taken in violation of international law; and (3) a jurisdictional nexus exists between the expropriation and the United States." *Schubarth v. Federal Republic of Germany*, 891 F.3d 392, 398–99 (D.C. Cir. 2018). "A plaintiff must make more than a nonfrivolous showing that FSIA's expropriation exception applies." *Id.* at 399.

There is no question that Plaintiffs' expropriation claims relate to their rights in property. The Court therefore turns to the second element from *Schubarth*, whether the seizure of Plaintiffs' property violated international law. To show that an alleged expropriation violates international law, a plaintiff must demonstrate that the expropriation violates a principle that has "crystallized into an international norm that bears the heft of customary law." *Helmerich*, 743 Fed. App'x at 449; *see also id.* at 450 ("In conducting this inquiry, we give substantial weight to the judgments and opinions of national and international judicial bodies, scholarly writings, and unchallenged governmental pronouncements that undertake to state a rule of international law."). Under that standard, the D.C. Circuit has said that it is a violation of international law when a state expropriates "the property of a *national of another state* . . . without compensation." *Id.* (emphasis in original) (citing Restatement (Third) of the Foreign Relations Law of the United States § 712(1)(c)). However, under the domestic takings rule, international law is silent when a state expropriates "property belonging to [that] country's own nationals." *Federal Republic of Germany*

10

*v. Philipp*, 141 S. Ct. 703, 711 (2021). In other words, where the domestic takings rule applies, the expropriation exception cannot. *See id.* at 715.

Thus, if Plaintiffs were Chinese nationals when their property was seized, then the seizures did not violate international law, and the expropriation exception cannot apply. Plaintiffs have not shown that they were nationals of any other country at the time of the seizures. The sole statutory provision that "confers United States nationality upon non-citizens is 8 U.S.C. § 1408." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015). That provision deals exclusively with the circumstances of an individual's birth and parentage; there is no suggestion that those provisions apply to any Plaintiff in this case. Li is not a United States citizen, nor is he a national of the United States. ECF 3 ¶ 28. Huang only became a United States citizen in 2020, and neither the Amended Complaint nor Plaintiffs' other motions make any allegation that she was a national before that. *Id.* at 26 n.*. Nor is there anything to suggest that either Li nor Huang were ever nationals of a country other than China or the United States. In summary, because neither Li nor Huang have shown they were anything other than Chinese nationals at the time of the expropriation, they cannot invoke the expropriation exception.

Shi's case is slightly different. Shi is a United States citizen. *Id.* ¶ 56. However, the Amended Complaint is silent on when he became one. Moreover, Plaintiffs, even after confronted with the argument that the timing of Shi's citizenship would be dispositive, have refused to answer that question.[7] ECF 37 at 8. Because Shi fails to "affirmatively and distinctly" allege facts that are "essential to federal jurisdiction," *Smith*, 270 U.S. at 459, the Court cannot find that the

---

[7] Plaintiffs justify that refusal based on the erroneous contention that Rule 8's liberal pleading standard excuses them from any requirement that they plead "detailed information regarding [Shi's] citizenship." ECF 37 at 8. But the Court's inquiry into subject matter jurisdiction is not governed by Rule 8. Rather, a plaintiff's pleading must "affirmatively and distinctly" demonstrate "the existence of whatever is essential to federal jurisdiction." *Smith*, 270 U.S. at 459.

expropriation exception is applicable to Shi's claims. Moreover, even if the Court were to assume Shi was a United States national when his property was seized, the expropriation exception to the FSIA would still not apply because there is no commercial nexus between the Unites States and Defendants. The expropriated property is not "present in the United States." *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1104 (D.C. Cir. 2017). Nor does the Complaint offer any non-conclusory facts to suggest that an instrumentality of the Chinese state "own[s] or operate[s]" the property. *Id.* Therefore, the expropriation exception cannot apply.

(b) The FSIA's terrorism exception does not apply.

Plaintiff Li suggests that the Court has jurisdiction over his claims of wrongful imprisonment and torture under the FSIA's terrorism exception. *See* 28 U.S.C. § 1605A. The terrorism exception abrogates immunity where a plaintiff seeks damages for injury or death caused by "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act," if those acts were "engaged in by an official, employee, or agent" of a foreign country. *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)). The terrorism exception "further requires that (i) the foreign country was designated a 'state sponsor of terrorism at the time [of] the act,' (ii) the 'claimant or the victim was' a 'national of the United States' at that time, and (iii) the 'claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim.'" *Id.* (quoting 28 U.S.C. § 1605A(a)(2)).

Here, because the State Department has not designated China a state sponsor of terrorism, *see State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last visited April 5, 2023), and because Li has never been a national of the United States, *see supra* Part III.A.2(a), the terrorism exception cannot apply.

      (c) <u>None of the international treaties and agreements cited by Plaintiffs supersede the FSIA to abrogate Defendants' immunity.</u>

Finally, Plaintiffs argue that the Court has jurisdiction over their claims pursuant to five separate international treaties and agreements. The Court disagrees. According to 28 U.S.C. § 1604, FSIA's presumptive immunity is granted "[s]ubject to existing international agreements to which the United States [was] a party at the time of enactment of this Act" in October 1976. Therefore, for an international agreement to abrogate FSIA immunity, that agreement would have to (a) either predate or supersede the FSIA and (b) create an independent cause of action.

Here, Plaintiffs point to: (1) the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; (2) the International Covenant on Civil and Political Rights; (3) the Universal Declaration of Human Rights; (4) the Charter of the United Nations; and (5) the International Labour Organization's Convention No. 29 Concerning Forced or Compulsory Labor. ECF 3 at 46 ¶ 238; *id.* ¶¶ 290–94. Because none of the cited agreements creates an independent cause of action, the Court determines that they do not abrogate FSIA immunity.

The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment "was signed in 1988 by a representative of the President and ratified in 1990 by the U.S. Senate." *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011). It is "non-self-executing and thus does not itself create any rights enforceable in U.S. courts." *Id.* Nor does the Torture Victim Protection Act—which was enacted in 1991, in part, to carry out the United States' obligations under the Convention, *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002)—create a cause of action against individuals or entities that are otherwise covered by FSIA immunity. *See Belhas v. Ya'alon*, 515 F.3d 1279, 1288–89 (D.C. Cir. 2008).

Likewise, none of the other agreements cited by Plaintiffs creates an independent cause of action. When the United States ratified the International Covenant on Civil and Political Rights in 1992, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004), it did so "on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Id.* at 735. Likewise, the Universal Declaration of Human Rights "does not of its own force impose obligations as a matter of international law." *Id.* at 734. The Charter of the United Nations "has been ratified by the United States, but nothing suggests that it was intended to be enforceable in federal courts." *United States v. Khatallah*, 160 F. Supp. 3d 144, 152 (D.D.C. 2016); *see also Medellin v. Texas*, 552 U.S. 491, 525–26 (2008). Finally, the Convention Concerning Forced or Compulsory Labor was never ratified by the United States and so cannot conceivably be binding on United States courts. *See* 39 U.N.T.S. 55.

Accordingly, the Court concludes that the individual Defendants in this case are immune from suit under the FSIA, and therefore dismisses, sua sponte, all claims against those Defendants for lack of subject matter jurisdiction.

### B. Plaintiffs fail to state a claim against the ICBC.

There is however, one Defendant who is not immune from suit under the FSIA: the ICBC. The ICBC filed a Motion to Dismiss all claims against it for, amongst other things, lack of subject matter jurisdiction, ineffective service, and failure to state a claim. ECF 29. The Court finds that the ICBC is not immune from suit under the FSIA, but dismisses Plaintiffs' claims against the bank for failure to state a claim under 12(b)(6).[8]

---

[8] The Parties dispute whether service was effective in this case. Because the Court dismisses the Amended Complaint on the merits, it need not reach that issue. *See Ciralsky v. CIA*, 355 F.3d 661, 674 (D.C. Cir. 2004) ("[O]ther things being equal, our jurisprudential preference is for adjudication of cases on their merits.").

1. *The ICBC is not immune from suit under the FSIA.*

As an initial matter, the Court concludes that the ICBC does not qualify for presumptive immunity under the FSIA. The FSIA explicitly contemplates that, under some circumstances, a corporation may be considered part of a foreign state. A "foreign state" includes "an agency or instrumentality" of the state, 28 U.S.C. § 1603(a), which is defined as:

> "[A]ny entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country."

*Id.* at § 1603(b). In its Motion to Dismiss, the ICBC cites to an affidavit from its own legal counsel, stating that the ICBC is a "joint-stock limited company incorporated in the People's Republic of China under the laws of that country," ECF 29 at 21 (citing ECF 20-3 ¶ 2), and that "[t]he two largest shareholders of ICBC Limited are Central Huijin Investment Ltd. (a 100% state-owned entity) and Ministry of Finance of the People's Republic of China, which together own 65.85% of ICBC Limited." *Id.* But that evidence, even if credited, does not show that the ICBC is an instrumentality of the Chinese state. That is because the FSIA requires that a company be majority owned by the state itself (or a *political* subdivision of the state). *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003). It is immaterial for purposes of the FSIA that Central Huijin Investment Ltd., which owns shares of the ICBC, is itself state-owned. *See id.* (clarifying that "[c]ontrol and ownership" of a corporation "are distinct concepts"). Therefore, the Court must conclude, on this record, that the ICBC is not an instrumentality of the Chinese state.

2. *Nonetheless, Plaintiffs' claims against the ICBC must be dismissed under the act of state doctrine.*

In its Motion to Dismiss, the ICBC urges that Plaintiffs' claims against it must be dismissed under the act of state doctrine. *See W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S.

15

400, 404 (1990). The Court agrees. The act of state doctrine is grounded in the "domestic separation of powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." *Id*. "The doctrine directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality . . . of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS*, 163 F.3d 1363, 1367 (D.C. Cir. 1999). When the doctrine applies, it serves as a "rule of decision" requiring that such official acts "shall be deemed valid" for purposes of deciding a case. *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).

Here, Plaintiffs allege the ICBC played a "pivot[al] role in the conspiracy designed and devised to illegally expropriate [Plaintiffs'] properties." ECF 3 ¶ 200. Specifically, the Complaint alleges that the Guilin Branch Office of the ICBC petitioned to serve as the court-appointed receiver for Li's seized properties, *id.* ¶¶ 204–06, and "initiated an illegal midnight auction to sell" those properties for the "disproportionately low price . . . approximately a quarter in comparison to then fair market value," *id.* ¶ 204. In exchange, according to Plaintiffs, the ICBC received "corrupted economic benefits for the dirty reward of their collusion with the corrupted Communist regime they knew or should have known to be anti-humanity." *Id*. The Complaint also asserts, conclusorily, that the ICBC is legally liable for "aiding and abetting and/or ratifying" Li's arrest, detention, and torture, *id.* ¶¶ 250, 255, 265, 270, as well as the pain, suffering, and emotional distress Plaintiffs suffered as a result of the government's actions, *id.* ¶ 281.

Of course, the Court may not credit Plaintiffs' unsupported legal conclusions, even if they are offered in the guise of factual statements. *Browning*, 292 F.3d at 242. Regardless, if the Court assumes, as it must, that the seizure of Li's properties, his detention, and the remedies granted him

by the Chinese courts were valid, *see World Wide Minerals*, 296 F.3d at 1165, none of Plaintiffs' claims survive. Even if the ICBC's auction of the Li's seized property was as deficient as Plaintiffs claim, the ICBC's failure to get a fair price for the properties harmed the Chinese government, not Plaintiffs. As for the seizure of Huang's property and Shi's apartments, the Court notes that the Complaint contains no non-conclusory allegations that the ICBC was involved in the seizure or resale of those properties.

Because the act of state doctrine requires the Court to assume the validity of all official actions taken by the Chinese government within its own territory, and because the Complaint fails to state a claim against the ICBC if the Chinese government's actions were valid, the Court grants the ICBC's Motion to Dismiss all claims against it.

## IV. CONCLUSION

Plaintiffs' claims against Keqiang Li, Shengkun Guo, Xinshe Lu, Yaojun Meng, and the John Does are DISMISSED sua sponte for lack of subject matter jurisdiction. Furthermore, the Court GRANTS the ICBC's Motion to Dismiss Plaintiffs' claims against it for failure to state a claim. Having thus disposed of all Plaintiffs' claims against all Defendants, the Court DISMISSES the case.

A separate order accompanies this opinion.

**SO ORDERED.**

DATE: April 5, 2022

_____<br>
Jia M. Cobb<br>
U.S. District Court Judge